Opinion delivered March 9, 1887.

No. 2300.

## Claude Jackson *v*. The State.

1. Continuance—Diligence.—Seven or eight days prior to his trial were allowed by the defendant to elapse after an attachment for his absent witness was returned "not found," and in that interim he took no steps to procure the attendance of the witness. *Held* that this failure to sue out further process for the witness shows a want of due diligence, and justifies the refusal of the continuance.

2. Same—New Trial.—That a continuance was refused because of a want of diligence does not absolve the trial court, on the motion for a new trial, from the duty of considering the materiality and probable truth of the testimony expected from the absent witness in connection with the evidence adduced at the trial. Though an application for a continuance to obtain absent testimony fails to comply with the requirements of the statute, if, in view of the evidence adduced at the trial, the absent testimony appears to be material and true, it should be considered in determining the motion for a new trial.

Appeal from the District Court of Robertson. Tried below before W. O. Campbell, Esq., special judge.

The conviction in this case was in the second degree for the murder of Dan Wyant, in Robertson county, Texas, on the fourth day of July, 1885. The penalty assessed by the verdict was a term of five years in the penitentiary.

Mrs. Gallagher was the first witness for the State. She testified, in substance, that she was the boarding mistress of the bridge gang on the International and Great Northern railroad on the section adjacent to Hearne. The hands were boarded on the cars. The eating cars stopped in Hearne to spend the fourth

of July, 1885. Deceased came into the dining car about noon on that day and called for his dinner, and while he was eating, the defendant came to the car door and told him that if he did not retract what he had said about his, defendant's, mother and sister, that either he, defendant, or the deceased would "croak" before nine o'clock that night. He then left, and in a short time returned, entered the car and took his seat at the dining table opposite the deceased. The witness observed that he then had an open razor in his hand. He again told deceased that he would have to retract what he had said about his mother and sisters. Deceased replied that he had said nothing to retract. The two then rose from the table, the defendant with the razor in his hand and the deceased with a molasses pitcher in his hand. At this point the witness interfered and advised the two to postpone their row until they were sober. The deceased put the pitcher on the table, left the car and went into the men's car. Defendant complained of deceased's statements about his mother, and witness remarked to him: "He knows nothing about your mother. Wait until you are both sober and you will settle it." Defendant then left the car. A short while afterwards witness saw the defendant jump from the men's car with an adz in one hand and a razor in the other. As he sprang from the car he cried: "I won't let him kill me with an adz." Deceased then came out of the men's car and witness saw that his throat was cut. Defendant was arrested on that same evening.

Cross examined, the witness said that both the defendant and deceased were drunk at the time of their dispute in the dining car. Up to that time they had been especial friends, lending each other money, sleeping together and wearing each other's clothes. The witness knew Thomas Franklin and William Murphy, two members of the bridge gang, who were at the cars at the time of the killing.

John Kimbrough, the engineer of the bridge train, was the next witness for the State. He testified, in substance, that he side-tracked his train near the freight depot in Hearne, early on the morning of July 4, 1885, in order to enable the bridge hands to spend the holiday in that town. Several of the men, including witness, defendant and deceased, went up town early in the forenoon, to enjoy themselves. They took several drinks together, separating about ten o'clock. Witness passed Renfro & Cox's saloon about one o'clock, on his way back to the train to get dinner. Defendant just at that time came out of the saloon

and joined witness.  The two walked along together, eating peaches provided by witness, and talking, until they reached a point about two hundred yards distant from the train, when they met two men, strangers to witness.  Defendant stopped to talk with the men and witness went on.  Just before he reached the dining car he looked back and saw that deceased had joined the defendant and the strangers, and that they were in conversation.  Witness took his seat at the table in the dining car, and was soon joined by the deceased, who called for and obtained a cup of coffee.  About this time the defendant came to the car door, struck it with his hand, and said to deceased: "Dan, you have got to take back what you said, or either you or I will croak before nine o'clock to-night."  He then went off towards the sleeping car, but presently returned, took his seat and called for his dinner.  While eating he again demanded that defendant retract what he had said.  Defendant replied: "I have said nothing to take back."  Deceased and defendant then rose from the table, and witness saw that defendant had a razor in his hand.  Seeing that the quarrel was likely to be serious, the witness took deceased into the sleeping car and left him for a few minutes.  Returning, after a short time, he found the defendant and deceased in the sleeping car, quarreling.  Defendant again demanded that deceased retract something said about his, defendant's, mother and sisters.  The deceased replied that he had said nothing about defendant's mother and sisters, and therefore could retract nothing, and added: "But if I have said anything to hurt your feelings, I will take it back."  It was then proposed to return to town.  Deceased replied that he could not go, as he had no clean shirt.  Defendant said to him: "Take one of mine.  You can have any thing I have got, but must take back what you said, or I will cut your throat from ear to ear."  Deceased replied: "No, you would not hurt me; you think too much of me."  Defendant touched deceased's cheek with a razor, and said: "There is a test that I will cut your throat if you do not take back what you said."  Deceased, feeling that the razor had cut him, said: "Claude, you have got your foot into it; there is a law that will punish you for cutting me."  Deceased then stooped and seized an adz that was lying on the floor, but before he could straighten up defendant cut his throat with the razor, the cut extending almost clear around the neck, took the adz from deceased and sprang out of the car.  Deceased was taken from the car and placed in a sitting posture on a

railroad tie. Defendant, who was standing near by, rolled and smoked a cigarette. Deceased was taken thence to the Conway Hotel, where he died in about two hours. Both the defendant and the deceased were drinking at the time of the difficulty. Up to that time they had been intimate and almost inseparable friends. Thomas Franklin and William Murphy were in the sleeping car at the time of the cutting, and saw all that occurred.

The State closed.

McFarland, the first witness for the defense, testified, in substance, that, while lying in his bunk in the sleeping car, a short while after dinner on July 4, he heard the defendant and the deceased as they came from town to the train. They were talking loud, and, on looking out, witness saw that they were both gesticulating and evidently quarreling. Presently the defendant came into the car and asked somebody for a pair of steel knucks. Failing to get them, he went to his trunk, got a razor and left. Presently the deceased came into the car, seized an adz and remarked that defendant had threatened him, and that he would "fix" defendant. About that time the defendant re-entered the car, and, evidently overheard deceased. He demanded that deceased retract something he had said about his mother and sisters. Deceased replied that he would retract nothing. This manner of quarreling progressed for some time, when deceased, declining again to retract anything in particular, remarked that if he had said anything to hurt defendant's feelings he was sorry for it. Defendant's face then brightened up, and deceased asked him for the loan of a clean shirt. Defendant replied that deceased could have anything he had, but must retract what he said about his mother and sisters, or he would cut deceased's throat. Deceased said, in reply: "You would not hurt me; you think too much of me." Defendant touched deceased's face with the razor, making a small scratch, with the remark: "That's a test that I will cut your throat if you do not take it back." Deceased said: "Now Claude, you have got your foot in it; look out for yourself," and stooped to get the adz. A scuffle for the possession of the adz ensued, and when defendant had been pressed to the edge of the car door he cut the deceased throat with the razor, wrenched the adz from deceased's hands and sprang out of the car.

Cross examined, the witness said that Franklin and Murphy were in the sleeping car, and occupied much better positions from which to see all that occurred during the difficulty than he

---

---

did.   Defendant and deceased were both drunk at the time of the difficulty.

James Brady testified, for the defense, that he was marshal of Hearne at the time of the fatal difficulty.   On that day the defendant, deceased, Tom Prior and witness engaged in a game of billiards at the saloon of Cox & Renfro.   Deceased got to throwing back the buttons as often as any one of the party, except himself, made a score, and finally defendant said that if deceased could not play fair he would quit and pay for the game. He thereupon put up his cue and invited the party to the bar to drink; which invitation was promptly accepted by all parties. After this the deceased said to defendant: "You are d—d honest and liberal; where did you come from anyhow, and where do your people live?"   Defendant said that he came from Georgia, where he had a mother and some sisters living.   Deceased then asked: "What are your mother and sisters doing?  Don't they live on corn bread?"   Defendant replied: "They own a little farm, which they rent out for a living."   Deceased replied: "You are a d—d liar; they are d—d whores and f—k for a living."   Defendant and deceased then walked towards the back of the saloon, and witness followed, expecting a fight. Near the door deceased said to defendant: " Let's go with these nigger whores."   Defendant replied: "I don't go to such places."   The deceased retorted: "You are a d—d liar; your mother and sisters are no better than these nigger whores." Witness then left and did not see the parties again until after the killing.   The language used by deceased about defendant's mother and sisters was used just after drinking.   At that time the parties were near the counter, behind which was either Mr. Cox or Mr. Renfro, who had just served the party.   Witness left the parties, because he saw that there was not going to be any trouble, and he would not be needed in his capacity as conservator of the peace.   All the parties were strangers to witness.

J. C. Renfro testified, for the defense, that he was one of the proprietors of Cox & Renfro's saloon.   Defendant, deceased, Brady and Prior played a game of billiards in that saloon on the morning of the fatal day.   As often as a score was made and marked the deceased would  move the counters back.   Finally the defendant declined to play longer, and invited the party to the bar to drink.   While at the counter defendant and deceased got to talking about their manhood.   Deceased, in a bragging manner, said that he was a John L. Sullivan, and defendant

said that he was equal to any emergency. Witness did not hear the deceased use the language imputed to him by Brady, but was busy during that morning with a large number of customers, and it was possible for the language to have been used without his hearing it.

Mrs. Gallagher, recalled for the defense, testified that she knew the reputation of the State's witness, Kimbrough, for truth and veracity, and that it was bad. Kimbrough was not in the boarding car when defendant and deceased were in there on the day of the cutting.

Charles Hightower, conductor of the bridge train, corroborated Mrs. Gallagher as to Kimbrough's reputation for truth and veracity. He testified further that Mrs. Gallagher called him to the dining car, in which defendant and deceased were quarreling. Deceased passed from that car just ahead of witness, and defendant followed behind witness. Defendant and deceased went into the sleeping car, and witness, stopping for a moment at the door, went on to his caboose, and did not again see the parties until after the cutting.

The testimony of the absent witness, Franklin, referred to in the opinion of this court, would, as alleged in the defendant's application for a continuance, have been to the effect that he was present in the car in which the fatal difficulty occurred, and in such a position as to see and hear all that passed at the time of the cutting; that the deceased made careful preparation to kill the defendant by placing an adz, a deadly weapon, in such a position as to get it readily; that defendant saw the deceased when he so placed the adz; that the deceased brought on the difficulty in the sleeping car, and had hold of the handle of the adz at the time of the cutting with the razor, and that all of the above described preparation to kill the defendant was made by the deceased before the final and fatal difficulty.

The motion for new trial raised the question discussed in the opinion.

*O. D. Cannon* and *J. E. Bishop*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was indicted for the murder of one Dan Wyant, by cutting his throat with a razor. Up to within a very short time—perhaps less than an hour be-

fore the killing—the parties had lived upon the most intimate terms, their friendship and affection for each other being of a character similar to that existing between brothers. In a drunken spree, on the fourth of July, deceased made uncalled for remarks of a most insulting, vulgar and outrageous kind, concerning the mother and sisters of appellant, whom he did not know, and appellant's demand that he should retract the language, and his refusal to do so was the cause of the unfortunate altercation which resulted in the homicide. Upon the trial appellant was found guilty of murder of the second degree, with punishment assessed at five years imprisonment in the penitentiary.

Before announcement of ready for trial, defendant made an application for continuance for three witnesses; which application the court overruled upon the ground that it did not show proper and legal diligence on the part of defendant to obtain said witnesses. Without noticing the diligence as to the other two witnesses, the facts shown as to the absent witness Thomas Franklin, are that he had been attached, brought to court and placed under recognizance, in the sum of two hundred dollars, as a witness for defendant, on the fifth day of January, 1886; that he had never been discharged from said recognizance, and that, in obedience to the same, the witness had been in attendance upon the court at each and every term of the court since and up to the term of trial. That on the seventeenth day of January, 1887, the day fixed by the court for taking up the criminal docket, defendant had the witness Franklin called, and finding him absent procured a forfeiture of his recognizance by the court, and on said day sued out an alias attachment for said witness. This attachment was returned by the sheriff of Anderson county on the twenty-third of January "not found." On the thirty-first of January the motion for continuance was overruled, and on the same day the trial, we presume, was had and concluded, because the date of the judgment is January 31, though the charge of the court bears the file mark date of February 2, A. D. 1887. Thus it will be seen that between the date of the return of the attachment and the judgment, seven or eight day elapsed without any further steps taken by defendant to get his witness. His failure to sue out other process in the interval does show such want of diligence as warranted the court in overruling his application in the first instance.

But, whilst the court properly ruled in the first instance, the

question is as to the correctness of the court's ruling upon defendant's motion for new trial after conviction, when it was the duty of the court again to consider the facts stated in connection with the evidence adduced at the trial. It is provided expressly by the statute, "that should an application for continuance be overruled and the defendant convicted, if it appear upon the trial that the evidence of the witness or witnesses named in the application was of a material character, and that the facts set forth in said application were probably true, a new trial should be granted." (Code Crim. Proc., art. 560, subdiv. 6.) This rule is not limited solely to applications which on their face show exact compliance with the statutory requisites, but most likely was intended to operate as well in those cases where the application might be defective if the statutory requirements were the sole tests to be applied. The rule is that, even if the application for continuance lacks some of the statutory requirements, if the proposed evidence appears material and true, it should be considered and weighed in connection with the evidence adduced on the motion for new trial. (Stanley v. The State, 16 Texas Ct. App., 393; Beatey v. The State, Id., 421, and for a case directly covering the question as here made by the facts, see Schultz v. The State, 20 Texas Ct. App., 315.)

But it is contended that the court did not err in overruling defendant's motion for a new trial, considered with reference to the facts stated in the motion for continuance, because testimony substantially the same as that proposed by the absent witness has been produced at the trial. The rule thus invoked is well settled. (Walker v. The State, 13 Texas Ct. App., 618; Beatey v. The State, 16 Texas Ct. App., 421, and authorities there cited.)

McFarland, a witness for defendant, whose testimony does not seem to have been impeached, and who was in the car at the time the difficulty occurred, and was lying in an upper sleeping bunk, says: "I know Thomas Franklin and William Murphy. They were both in the car at the time of the difficulty and had better opportunities to see and hear what occurred than I did. They were lying on bunks below me. I was on an upper bunk." The State's witness, Kimbrough, who claims to have seen the difficulty, was attempted to be impeached as to his reputation for truth and veracity His evidence is certainly not the same as that claimed for the absent witness. As adduced, we can not

say that the testimony is substantially the same as that proposed to be established by the absent witness.

We are of opinion, upon the facts shown, that the court should have granted the motion for a new trial. Several other errors are complained of, most of which are not likely to occur at another trial; nor will we discuss the questions raised as to the charge of the court. Because the court erred in overruling defendant's motion for a new trial, the judgment is reversed and the cause remanded.

*Reversed and remanded.*